**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**IN THE MATTER OF**                          CIVIL ACTION
**ARIES MARINE**
**CORPORATION, ET AL.**                          **No. 19-10850**
**c/w 19-13138**
**REF: ALL CASES**

SECTION I

## ORDER & REASONS

Before the Court is a motion[1] for summary judgment filed by defendant and

third-party plaintiff Fugro USA Marine ("Fugro") and a motion[2] for summary

judgment filed by petitioner-in-limitation Aries Marine Corporation ("Aries"). Third

party defendants Fluid Crane and Construction, Inc. ("Fluid Crane") and United Fire

and Safety, LLC ("United Fire") oppose the motions.[3] Also before the Court is a

motion for summary judgment filed by United Fire[4] and a motion for summary

judgment filed by Fluid Crane,[5] both of which are opposed by Fugro[6] and Aries[7].  For

the reasons below, the Court grants the motions in part and denies them in part.

---

[1] R. Doc. No. 153.
[2] R. Doc. No. 158.
[3] R. Doc. No. 180 (opposition by Fluid Crane); R. Doc. No. 185 (opposition by United Fire). Both Fluid Crane and United Fire filed a single opposition to Fugro's and Aries' motions.
[4] R. Doc. No. 160.
[5] R. Doc. No. 169.
[6] R. Doc. No. 179.
[7] R. Doc. No. 184.

## I.      FACTUAL BACKGROUND

This matter arises out of a November 18, 2018 incident in which the RAM XVIII, a liftboat owned and operated by Aries Marine Corporation ("Aries"), and chartered by Fieldwood Energy, LLC ("Fieldwood"), capsized in the Gulf of Mexico. Fugro assisted in the operation by providing data and imaging of the sea floor on which the liftboat was placed. Fluid Crane and United Fire employed the personal injury claimants.[8]

After this incident, Aries filed a complaint for exoneration or limitation of liability in this Court.[9] The personal injury claimants filed claims in the limitation action,[10] as well as a separate complaint against Fugro and Fieldwood, which was consolidated with the limitation action.[11] Aries filed a counterclaim against Fluid Crane[12] and a third-party complaint against United Fire[13] alleging that Aries is entitled to defense and indemnity pursuant to certain provisions in the contracts between Fieldwood and Fluid Crane and Fieldwood and United Fire. Fugro then filed

---

[8] Six of the seven claimants were employed by Fluid Crane and Construction. The seventh, Glenn Gibson, was employed by United Fire and Safety.
[9] R. Doc. No. 1.
[10] R. Doc. Nos. 6, 13.
[11] E.D. La. Case No. 19-13138.
[12] R. Doc. No. 43. Fluid Crane had previously filed a claim in the limitation action. R. Doc. No. 9.
[13] R. Doc. No. 45.

a third-party complaint[14] against both Fluid Crane and United Fire, asserting that Fugro is entitled to the same benefits.[15] All four parties now seek summary judgment.

### a.   The Contracts

The instant motion concerns the various contracts that governed the relationships between Aries, Fieldwood, Fugro, Fluid Crane, and United Fire.

Fieldwood and Fluid Crane entered into a Master Service Contract ("MSC") dated November 1, 2013.[16] Fieldwood and United Fire also entered into an MSC dated November 1, 2013.[17] Both MSCs contained certain indemnity provisions whereby Fluid Crane and United Fire "agree[d] to release, indemnify, protect, defend and hold harmless" Fieldwood "from and against any and all claims for injury, illness or death" or property damage by their own employees.[18] Both MSCs likewise contained "cross indemnity" provisions whereby Fluid Crane and United Fire agreed to provide the same defense and indemnification to members of the "third party contractor group" so long as those third party contractors "execute[d] [substantially similar] cross indemnification and waivers."[19]

---

[14] Fugro initially filed a crossclaim against Fluid Crane and United Fire in the limitation action, which was marked deficient. R. Doc. No. 87. Fugro then filed a third-party complaint in the lawsuit initiated by claimants, which by then had been consolidated with the limitation action. R. Doc. No. 90.

[15] R. Doc. No. 90.

[16] R. Doc. No. 153-1, ¶ 4; R. Doc. No. 180-7, ¶ 4.

[17] R. Doc. No. 153-1, ¶ 8; R. Doc. No. 185-5, ¶ 8.

[18] R. Doc. No. 153-3, at 7 (Fluid Crane MSC); R. Doc. No. 153-4, at 7 (United Fire MSC).

[19] R. Doc. No. 153-3, at 8 (Fluid Crane MSC); R. Doc. No. 153-4, at 8 (United Fire MSC).

Fieldwood and Fugro entered into an MSC dated November 26, 2013,[20] and supplemented by a "Joinder to MSC" dated November 15, 2018,[21] whereby Fugro agreed to provide substantially similar indemnity and defense provisions in favor of members of the "third party contractor group." Aries and Fieldwood entered into an MSC dated November 1, 2013 containing substantially similar indemnity and defense provisions.[22]

In short, the contracts between Fieldwood on the one hand and Aries, Fugro, Fluid Crane, or United Fire on the other provided that each entity would indemnify the other entities from claims asserted by their own employees, as well as be responsible for defense costs for such claims.[23] Because the claimants in this action were employed either by Fluid Crane (Tomas Arce Perez, Lee Bob Rose, Gabriel Vilano, Ronald Williams, Gilberto Gomez Rozas, and Calvin Abshire) or United Fire (Glenn Gibson), only Fluid Crane's and United Fire's defense and indemnification obligations are potentially triggered here.

The parties do not dispute that the above-referenced agreements were signed and in effect at the time of the incident, nor that their language provides for the indemnification that Aries and Fugro seek. The only dispute is whether the indemnification provisions are enforceable. The answer to this question, as discussed

---

[20] R. Doc. No. 153-5, at 8.
[21] R. Doc. No. 153-6 (Fugro USA Marine, Inc., agreeing to be bound by the 2013 MSC after "certain of the [parties to the 2013 agreement] subsequently merged into and formed [Fugro USA Marine, Inc.]").
[22] R. Doc. No. 158-5, at 11–12.
[23] No party disputes that Aries, Fugro, Fluid Crane, and United Fire are third-party contractors within the meaning of the MSC.

below, turns on whether state law or federal maritime law applies. If state law applies, the Louisiana Oilfield Indemnity Act ("LOIA") bars enforcement of the indemnification provisions, assuming certain other statutory requirements are met, as discussed *infra*. If federal maritime law applies, however, the indemnification provisions are enforceable, and Fluid Crane and United Fire are contractually obliged to indemnify Aries, Fugro, and Fieldwood for the claims asserted by the Fluid Crane and United Fire employees.

### b.    The Work

The MSCs make no specific mention of the job that was underway at the time that the RAM XVIII listed and capsized. Instead, the particulars of that job were described in an email work order from Clarence Oliva, a Fieldwood representative, sent to Fluid Crane and United Fire personnel on November 14, 2018, at 9:36 A.M. That email, which listed certain personnel and equipment, stated that "[p]ersonnel need to arrive in time for check in for 05:00 departure" to the platform on November 16, 2018.[24] The email does not mention the involvement of the RAM XVIII, or any vessel.

According to testimony by Aries' personnel manager, Fieldwood contacted Aries "two or three days" before the job to ensure that Aries had a liftboat available for the job.[25] Fieldwood also corresponded with Aries about chartering the RAM XVIII during the morning of November 14, 2018, with final arrangements being made at

---

[24] R. Doc. No. 160-7; R. Doc. No. 169-6.
[25] R. Doc. No. 158-14, at 3 (deposition page 57:11–:12).

11:30 A.M.[26] A Fieldwood representative then informed Fugro of the plan to charter the vessel via email at 11:43 A.M.[27] No party points to evidence suggesting that any representative of Fluid Crane or United Fire was contacted regarding the chartering of the liftboat.

Both the Fluid Crane and United Fire workers traveled to the platform via a crew boat. The workers initially boarded a different stationary platform, understanding that they would be eating and sleeping on that platform.[28] The workers appeared to have learned that they would be eating and sleeping on the RAM XVIII once they were already on the WD 68-U platform.[29] The workers worked on the platform without incident on November 16 and 17. The liftboat's crane was used to move equipment on the platform.[30] They ate and slept aboard the RAM XVIII. In the early morning hours of November 18, 2018, the vessel listed and eventually capsized.

---

[26] R. Doc. No. 169-18 (email correspondence between a Fieldwood representative and an Aries representative, dated November 14, 2018 and time stamped between 7:50 A.M. and 11:30 A.M.).

[27] *Id.* at 3.

[28] R. Doc. No. 169-3, ¶ 48 ("The Fluid Crane crew boarded the "mothership" platform with the understanding that they would be eating and sleeping on that platform and were even assigned bunks."); R. Doc. No. 179-8, ¶ 48 (Fugro admitting the same); R. Doc. No. 184-1, ¶ 48 (Aries denying the same, but only on the basis that it is "irrelevant and immaterial to Court's consideration of whether a contract is maritime in nature"). United Fire's motion does not contain a similar statement of fact.

[29] R. Doc. No. 169-3, ¶ 49; R. Doc. No. 179-8, ¶ 49; R. Doc. No. 184-1, ¶ 49. The parties disagree about exactly when the workers learned they would be staying on the liftboat, but no party asserts that they learned this information prior to arriving. *See also* R. Doc. No. 160-2, at 333:24–334:6 (Glenn Gibson's testimony regarding seeing the RAM XVIII approaching the platform).

[30] R. Doc. No. 153-1, ¶ 23; R. Doc. No. 180-7, ¶ 23; R. Doc. No. 185-5, ¶ 23. The parties dispute whether use of the vessel's crane was "necessary." *See* R. Doc. No. 180-7, ¶ 23. Aries further asserts that the vessel's crane was used to transfer personnel, which

## II.    STANDARD OF LAW

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little*

---

Fluid Crane and United Fire dispute. R. Doc. No. 158-1, ¶ 13; R. Doc. No. 180-7, ¶ 13; R. Doc. No. 185-5, ¶ 13.

*v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. See *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

If the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must then articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). These facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "A non-movant will not avoid summary judgment by presenting "speculation, improbable inferences, or unsubstantiated assertions." *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015) (quotation and citation omitted). If the nonmovant fails to

meet their burden of showing a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

This matter is set for a bench trial. Therefore, so long as "the evidentiary facts are not disputed and there are no issues of witness credibility," *Manson Gulf, L.L.C. v. Modern Am. Recycling Serv.*, 878 F.3d 130, 134 (5th Cir. 2017), "the district court has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Jones v. United States*, 936 F.3d 318, 321–22 (5th Cir. 2019) (quotation and citation omitted).

## III.   ANALYSIS

The Court first briefly explains the core issue raised in the instant motions. Pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), federal jurisdiction extends to the Outer Continental Shelf. 43 U.S.C. § 1333. However, OCSLA directs that the "laws of each adjacent [s]tate" apply to "that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf." *Id.* § 1333(a)(2)(A).

"[A]djacent state law applies as surrogate federal law under OCSLA" so long as the following conditions are met:

(1) The controversy must arise on a situs covered by OCSLA (*i.e.* the subsoil, seabed, or artificial structures permanently or temporarily attached thereto).

9

(2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law.

*Texaco Expl. & Prod., Inc. v. AmClyde Engineerd Prods. Co., Inc.*, 448 F.3d 760, 774 (5th Cir. 2006).

There is no dispute that the first condition is met, as the WD 68-U platform is permanently affixed to the Outer Continental Shelf. The third condition is also undisputed, as "the Fifth Circuit has specifically held that nothing in the LOIA is inconsistent with federal law." *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 189 (5th Cir. 2009) (alteration, quotations, and citation omitted). The only dispute, therefore, is whether federal maritime law applies of its own force. All parties agree that this depends on whether the contracts at issue are maritime contracts (requiring application of federal law) or nonmaritime contracts (requiring application of Louisiana law pursuant to the OCSLA).

### a. *In re Larry Doiron*

As stated, the primary question before the Court is whether the contracts between the parties were maritime contracts. Resolution of this question in this context requires a two-step analysis: "First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters? . . . Second, if the answer to the above question is 'yes,' does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract? If

so, the contract is maritime in nature." *In re Larry Doiron, Inc.*, 879 F.3d 568, 576 (5th Cir. 2018) (en banc).[31]

The parties agree that the answer to the first question—whether the contract is one to provide services to facilitate the drilling or production of oil and gas on navigable waters—is yes.[32] Accordingly, the question before the Court is whether the contract provided or the parties expected that a vessel, here the RAM XVIII, would play a substantial role in the completion of the contract. Aries and Fugro contend that the answer to this second question is yes, that federal maritime law therefore applies, and the indemnity provisions in the contract are enforceable. Fluid Crane and United Fire contend that the answer is no, that state law therefore applies, and that state law bars the indemnity provisions in the contracts.

The *Doiron* "test places the focus on the contract and the expectations of the parties." *Id.* "Even significant vessel involvement isn't enough if that involvement was unexpected." *Barrios v. Centaur, LLC*, 942 F.3d 670, 681 (5th Cir. 2019) (citation omitted); *accord In re Crescent Energy Servs., LLC*, 896 F.3d 350, 359–60 (5th Cir. 2018) ("We must remember that the contracting parties' expectations are central.").

However, where "[t]he scope of the contract [is] unclear; [or] the extent to which the parties expect vessels to be involved in the work [is] unclear . . . courts may permit the parties to produce evidence of the work actually performed and the extent of

---

[31] *Doiron* revised and simplified the Fifth Circuit's previous six-part maritime contract test, as set forth in *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir. 1990).

[32] *See* R. Doc. No. 153-2, at 17; R. Doc. No. 158-2, at 9; R. Doc. No. 160-1, at 8; R. Doc. No. 169-1, at 23.

vessel involvement in the job." *Doiron*, 879 F.3d at 577; *accord Sanchez v. American Pollution Control Corp.*, 566 F. Supp. 3d 549, 556−57 (E.D. La. 2021) (Barbier, J.); *Carr v. Yellowfin Marine Servs., LLC*, 423 F. Supp. 3d 316, 321 (E.D. La. 2019) (Ashe, J.).

"Among the directions given by *Doiron* on what 'substantial' means is that if 'work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract.'" *Crescent*, 896 F.3d at 359 (quoting *Doiron*, 879 F.3d at 576 n.47).

The Fifth Circuit has clarified that the role of a vessel as transportation to and from the job site is irrelevant in this analysis. *Id.* Additionally, the fact that the claimants were allegedly injured while aboard the vessel is not dispositive. In *Doiron*, the Fifth Circuit wrote that "[t]he facts surrounding the accident are relevant to whether the worker was injured in a maritime tort, but they are immaterial in determining whether the worker's employer entered into a maritime contract." *Doiron*, 879 F.3d at 573–74; *accord Crescent*, 896 F.3d at 356–57 (noting that, after *Doiron*, "[w]e are no longer concerned about whether the worker was on a platform or vessel" when injured).

Because *Doiron* instructs this Court to consider the intent reflected in the contracts, the Court first considers what documents constitute the contracts between the parties. The parties agree that the relevant documents are the MSCs and the

email from Fieldwood representative Oliva.[33] This accords with Fifth Circuit precedent, which suggests that courts should consider not only general master agreements, but also more specific work orders or bids. *See Crescent*, 896 F.3d at 360 ("The Turnkey Bid is the relevant document, as the Master Service Agreement's more general language does not address the details of the P&A work."); *accord Carr*, 423 F. Supp. 3d at 321.

The Court therefore considers whether, together, the MSCs and the work order email "provide[d] or [ ] the parties expect[ed] that a vessel [would] play a substantial role in the completion of the contract." *Doiron*, 879 F.3d at 576. The MSCs clearly contemplate that the work performed may "involve[ ] worksites located offshore or within inland waters" and that, when that was the case, Fieldwood would "provide marine transportation."[34] The MSCs do not further mention the use of vessels. And, as discussed above, the use of a vessel as transportation to a worksite is not relevant to the *Doiron* analysis. *Crescent*, 896 F.3d at 359. The email work order likewise makes no mention of a vessel. Unequivocally, therefore, the contract did not provide that a vessel would play a substantial role in the completion of the contract. *Doiron*, 879 F.3d at 576.

The Court next considers whether the parties expected that the vessel would play a substantial role. *Id.* The Fifth Circuit has made clear that the parties'

---

[33] R. Doc. No. 153-2, at 17; R. Doc. No. 158-2, at 15; R. Doc. No. 160-1, at 4; R. Doc. No. 169-1, at 27. The parties also mention post-task work tickets as relevant, but neither party points to any particular work ticket as establishing any parties' expectations.

[34] R. Doc. No. 153-3, at 2; R. Doc. No. 153-4 at 2.

expectations should guide this analysis. *Crescent,* 896 F.3d at 359–60. There is sufficient evidence to conclude that Aries and Fugro expected the vessel to play a substantial role in the completion of the contract, as they were alerted to the chartering of the vessel in advance. However, there is no evidence that establishes that Fluid Crane or United Fire shared that expectation.

Aries and Fugro emphasize that an Aries manager was contacted by Fieldwood regarding Fieldwood's need for a liftboat "two or three days" before the email and job order.[35] This communication, however, does not establish either Fluid Crane's or United Fire's expectations. And neither Aries nor Fugro provides authority for the proposition that their expectations, even if not shared by Fluid Crane and United Fire, can establish that the "*parties* expected" that the vessel would play a substantial role. *Doiron*, 879 F.3d at 576 (emphasis added).

Fluid Crane's corporate representative testified that liftboats were "seldom" used to support Fluid Crane's work for Fieldwood."[36] Both Fluid Crane[37] and United

---

[35] R. Doc. No. 158-2, at 11.

[36] R. Doc. No. 184-3, at 20–27. Aries characterizes this testimony as stating that Fluid Crane knew that lift boats were used "from time to time." *E.g.*, R. Doc. No. 229, at 3. However, it was counsel, not the witness, who used that phrase. R. Doc. No. 184-3, at 21:15–:20:

> Q: "So did Fluid Crane, when it participated in the drafting of this 2013 master service contract, know that, from time to time, a lift boat could potentially be utilized in the performance of its work for Fieldwood?"
>
> A: "No, it was not. It was not stated that we would be using a lift boat anywheres [sic] in the contract. Was there a possibility? That would --you'd have to -- it's very seldom.";

*see also id.* at 27:3–:7 (Q: "You're saying from time to time lift boats were utilized by Fluid Crane between 2010 and 2018; correct?" A: "Very seldom.").

[37] R. Doc. No. 169-1, at 9.

14

Fire[38] point out that the prior jobs they did for Fieldwood did not require the use of vessels beyond transportation. Neither Aries nor Fugro dispute that previous jobs did not require liftboats.[39] And neither Fugro nor Aries have pointed to evidence supporting the conclusion that any representative of either Fluid Crane or United Fire were aware of the involvement of the RAM XVIII in the project until it arrived onsite.[40]

Both Fugro and Aries emphasize the extent of the vessel's involvement in the work performed, asserting that it played a crucial role. They cite cases in which vessels provided support similar to that which the RAM XVIII provided in this case. *E.g.*, *Crescent*, 896 F.3d 350; *Barrios*, 942 F.3d 670; *Quiroz v. C & G Welding, Inc.*, 16-15427, 2018 WL 6003554 (E.D. La. Nov. 15, 2018) (Zainey, J.). But, in the cited cases, the documents forming the contracts themselves provided for use of a vessel. *Crescent*, 896 F.3d at 352 (noting that the bid, which formed part of the contract, "identifies the equipment being provided that would perform the P&A work itself, the work crew details, *and a description of three vessels*" (emphasis added)); *Barrios*, 942 F.3d at 681 (holding that "[t]he Dock Contract makes clear that the parties expected

---

[38] R. Doc. No. 160-1, at 7–8.

[39] *E.g.*, R. Doc. No. 184, at 4 (arguing that the fact is irrelevant).

[40] Fugro's statement of uncontested facts states that "Fluid Crane first learned of the particulars of the job offshore through Vilano [a Fluid Crane employee], who *understood then* that his crew would be housed and fed aboard a liftboat." R. Doc. No. 153-1, ¶ 28 (emphasis added). Fugro is not specific about what "then" means, and the testimony it cites in support does not establish when, exactly, Vilano was made aware of use of the liftboat. Vilano specifically testified, however, that, when he was on the platform, "we saw [the vessel] from the distance, we saw it coming, and then the – it was getting close, *and then I got told that's going to be our home to stay*." R. Doc. No. 180-11, at 47:11–:14 (emphasis added).

[the vessel] to play a significant role in the completion of the work" because the project proposal noted the need for a crane barge and tug boat); *Quiroz*, 2018 WL 6003554, at *4 ("The Work Order establishes that the D/B SWING THOMPSON was anticipated to provide work in the removal of the WC 551A platform.").

Fluid Crane and United Fire, on the other hand, analogize the instant matter to *Doiron*, in which the Fifth Circuit held that the parties did not expect the vessel to play a substantial role because "the oral work order called for STS to perform downhole work on a gas well that had access only from a platform," and that the vessel was only required later when "the crew encountered an unexpected problem." *Doiron*, 879 F.3d at 577. *Doiron* is not exactly on point, as the RAM XVIII was not engaged as a result of an "unexpected problem." However, as in *Doiron*, the contracts here did not provide for use of a vessel. Moreover, as discussed above, it has not been shown that the parties shared an expectation that the vessel would play a substantial role.

Fugro's and Aries' focus on the role that the vessel ultimately played ignores the Fifth Circuit's instructions to focus on the expectations of the parties. It is true that the Fifth Circuit in *Doiron* stated that, when the parties' expectations are unclear, courts may rely on evidence of the actual use of the vessel in determining whether a contract is maritime or nonmaritime. *Doiron*, 879 F.3d at 577. The instant matter, however, does not present a problem of clarity. Aries and Fugro may have expected the vessel to play a substantial role in the completion of the work, but the same cannot be said of Fluid Crane and United Fire.

Because it is clear that Fluid Crane and United Fire did not expect the RAM XVIII to play a substantial role in the completion of the work, the Court finds it unnecessary to examine the extent to which the vessel was used during the work. *See Doiron*, 879 F.3d at 577 (indicating that the extent to which the vessel was actually used should be considered only if the scope of the contract or the parties' expectations are unclear). The Court concludes that the contracts at issue here fail the second prong of the *Doiron* test and are therefore nonmaritime contracts.

### b. "Pertains to a Well"

As noted, the LOIA bars indemnity provisions in certain contracts. La. Rev. Stat. Ann. § 9:2780. However, LOIA applies only where "the agreement (1) pertains to a well *and* (2) is related to exploration, development, production, or transportation of oil, gas, or water." *Transcontinental Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 991 (5th Cir. 1992) (emphasis in original). Aries and Fugro admit that the second prong is satisfied, but argue that there is a genuine issue of material fact as to whether the work at issue here "pertains to a well."[41]

"The Fifth Circuit has recognized that there is a point at which the subject of a contract no longer pertains to a well. The point is reached when the work relates to gas that 'can no longer be identified with a particular well or if the gas becomes so fundamentally changed by processing, commingling, or preparing it for distribution to its ultimate end user that it can no longer properly be attributed to a particular well.'" *Labove v. Candy Fleet, LLC*, No. 11-1405, 2012 WL 3043168, at *3 (E.D. La.

---

[41] R. Doc. No. 184, at 11; R. Doc. No. 179, at 18–19.

July 20, 2012) (Africk, J.) (quoting *Johnson v. Amoco Prod. Co.*, 5 F.3d 949, 953–54 (5th Cir. 1993)).

In *Transcontinental Gas*, the Fifth Circuit identified several factors as relevant to determining the point at which a contract for services does or does not pertain to a well.[42] Aries and Fugro appear to invoke only the "commingling" inquiry. In support of their argument, they point to testimony by Fieldwood's corporate representative indicating that "multiple wells fed via pipelines from Grand Isle 32 and Grand Isle 42 into the WD-68U platform."[43] This is true; however, the same representative testified that wells directly connected to the WD 68-U platform produce oil and gas, and that that oil and gas is not routed through another facility but rather goes

---

[42] These factors are: (1) whether the structures or facilities to which the contract applies or with which it is associated are part of an in-field gas gathering system; (2) the geographical location of the facility or system relative to the well or wells; (3) whether the structure in question is a pipeline or is closely involved with a pipeline; (4) if so, whether that line picks up gas from a single well or a single production platform or instead carries commingled gas originating from different wells or production facilities; (5) whether the pipeline is a main transmission or trunk line; (6) the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like; (7) the purpose or function of the facility or structure in question; (8) what, if any, facilities or processes intervene between the wellhead and the structure or facility in question; (9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question; and (10) any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny. *Labove*, 2012 WL 3043168, at *3–4.

[43] R. Doc. No. 184, at 12; see also R. Doc. No. 179, at 18 (noting that the Fieldwood representative "testified that oil and gas from offshore block/facility Grand Isle 32-GG flows into Fieldwood's WD 68U platform").

directly to the platform.[44] Aries and Fugro do not dispute the accuracy of that testimony.

The Court finds that the testimony pointed to by Aries and Fugro does not create a genuine issue of material fact as to whether the oil and gas produced at WD 68-U is "so fundamentally changed . . . that it can no longer properly be attributed to a particular well.'" *Labove*, 2012 WL 3043168, at \*3. Indeed, the representative's testimony, taken as a whole, suggests that the oil and gas produced there *can* be properly attributed to a particular well.[45]

Aries and Fugro point to no other evidence suggesting that the work here did not "pertain to a well" within the meaning of LOIA. The Court therefore concludes that Aries and Fugro have not pointed to evidence sufficient to create a genuine issue of material fact as to whether the work at issue in this matter pertained to a well. *See Little*, 37 F.3d at 1075.

Because the contracts are nonmaritime, and there is no genuine dispute as to whether the LOIA applies, the Court will deny Aries' and Fugro's motions for summary judgment on the issue of entitlement to indemnification. Correspondingly, the Court will grant Fluid Crane's and United Fire's motions as to indemnification.

---

[44] R. Doc. No. 169-16, at 163:23–164:12. The representative also responded affirmatively when asked whether "there's a pipe out somewhere in the WD 68-U and I can cut it out and say that oil came from that well?" *Id.* at 164:13–:17.
[45] *See supra* note 44.

### c. *Meloy v. Conoco*

In *Meloy v. Conoco*, "the Louisiana Supreme Court established an exception to the LOIA anti-indemnity rule that allows for the payment of defense costs when a potentially indemnified party is free from fault and the agreement provides for such an award." *Cardoso-Gonzalez v. Anadarko Petroleum Corp.*, 326 F. Supp. 3d 273, 283 (E.D. La. 2018) (Morgan, J.). "While the Louisiana Supreme Court's ruling in *Meloy* refers expressly to a finding of freedom from indemnitee fault 'after trial on the merits,' the rule in *Meloy* also applies to a finding of freedom from fault based on summary judgment." *Ardoin v. Northstar Interests*, 07-3210, 2008 WL 4877381, at *2 (E.D. La. Nov. 4, 2008) (Barbier, J.).

Both Aries and Fugro correctly argue that, if they are ultimately found free from fault, they will be entitled to defense costs pursuant to *Meloy*, even though the contracts at issue are found to be nonmaritime. The Court has already denied Aries' motion for summary judgment on the issue of liability, but Aries may yet be found to be free of fault at trial. Should this be the case, Aries will be entitled to defense costs.

This Court recently granted Fugro's motion for summary judgment on the issue of liability.[46] Because Fugro has been found free of fault, and the MSCs provide for defense costs, *Meloy* teaches that Fugro is entitled to payment for defense costs notwithstanding the fact that LOIA bars indemnities as a general matter.

---

[46] R. Doc. No. 239.

Because Fugro is entitled to defense costs, the Court will grant Fugro's motion to the extent it seeks to establish entitlement to those costs. [47] Should Aries ultimately be found free of fault, the Court will allow Aries to reurge its motion as regarding defense costs. Correspondingly, the Court will deny Fluid Crane's and United Fire's motions to the extent that they seek to avoid their obligations for defense costs.

### d.  Property Damage Claims

By its terms, LOIA bars contractual indemnification for "death or bodily injury." La. Rev. Stat. Ann. § 9:2780(A), (B). The statute does not mention property damage claims. Aries and Fugro argue that, even if LOIA bars enforcement of the indemnity provisions as to claimants' bodily injury claims, it does not bar their enforcement as to property damage claims. Neither Fluid Crane nor United Fire dispute that the LOIA's indemnification bar does not apply to property damage claims.

As discussed above, Fugro has already been found free of fault and its arguments regarding entitlement to indemnification for any claims asserted by the claimants are therefore moot. The Court therefore only addresses this argument as pertains to Aries.

United Fire argues that the property damage argument is immaterial because its sole employee involved in this matter, Glenn Gibson, is not seeking recovery for

---

[47] Because the Court grants Fugro's motion to the extent it seeks defense costs on the basis of *Meloy*, it does not address its argument that its defense costs for liability and property damage are indivisible. R. Doc. No. 179, at 4–6.

property damage.[48] As Gibson's discovery responses do not include any references to property damage claims,[49] it appears that United Fire is correct.

For its part, Fluid Crane argues that Fugro "never tendered a demand for defense and indemnity to Fluid Crane for any property damage claims."[50] Fluid Crane does not, however, make this argument with regard to Aries.[51] Fluid Crane also does not argue that its employees are not seeking recovery for property damage. Accordingly, the Court concludes that, to the extent that Aries is able to seek indemnification for property damage claims, it is entitled to that indemnification from Fluid Crane.

## IV.   CONCLUSION

In sum, the Court concludes that the contracts are nonmaritime contracts and that state law, rather than federal maritime law, applies pursuant to OCSLA. Louisiana law, by way of the LOIA, bars defense and indemnity provisions for personal injury and death claims. Fluid Crane's and United Fire's defense and indemnity obligations as to personal injury and death claims are therefore unenforceable. However, to the extent that any claimants assert property damage claims, the LOIA does not bar defense and indemnity obligations as to those claims. Additionally, because Fugro has been found free of fault via summary judgment,

---

[48] R. Doc. No. 228, at 6.

[49] *Id.*

[50] R. Doc. No. 226, at 6.

[51] Aries' counterclaim against Fluid Crane asserts entitlement to "any sums Aries Marine has paid or may be required to pay to" claimants. R. Doc. No. 43, ¶ 20.

Fluid Crane and United Fire may still owe defense costs to Fugro pursuant to *Meloy*. The same may be true of Aries if Aries is eventually found free of fault at trial.

Accordingly,

**IT IS ORDERED** that Fugro's motion for summary judgment is **DISMISSED AS MOOT** to the extent it seeks indemnification, as it has been found free of fault.[52]

**IT IS FURTHER ORDERED** that Aries' motion for summary judgment is **DENIED** to the extent that it asserts that the contracts are maritime contracts.

**IT IS FURTHER ORDERED** that Aries' motion for summary judgment is **GRANTED** to the extent it seeks indemnification for property damage claims.

**IT IS FURTHER ORDERED** that Fugro's motion is **GRANTED** to the extent it seeks entitlement to defense costs pursuant to *Meloy*.

**IT IS FURTHER ORDERED** that Aries' motion is **DISMISSED WITHOUT PREJUDICE** to the extent that it seeks defense costs pursuant to *Meloy*, as Aries has not been found free of fault. Should Aries ultimately be found free of fault, Aries may reurge its entitlement to defense costs.

**IT IS FURTHER ORDERED** that Fluid Crane's and United Fire's motions for summary judgment are **GRANTED** to the extent that they assert that the contracts are nonmaritime.

**IT IS FURTHER ORDERED** that Fluid Crane's and United Fire's motions are **DENIED** to the extent they seek dismissal of Aries' and Fugro's claims for defense costs.

---

[52] Fugro remains a party to this matter by way of its third-party complaint.

23

New Orleans, Louisiana, February 3, 2023.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**